UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

ERICA N.,

                     Plaintiff,       :        24-CV-8700 (JGK) (RWL)

           - against -

COMMISSIONER OF SOCIAL SECURITY   :    **REPORT & RECOMMENDATION**
ADMINISTRATION,                      :    **TO HON. JOHN G. KOELTL:**
                                       :        **SOCIAL SECURITY**

               Defendant.   :

-------------------------------------------------------------X

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff, represented by counsel, commenced the instant action against Defendant Commissioner (the "Commissioner") of the Social Security Administration (the "Administration"), pursuant to the Social Security Act (the "Act"), 42 U.S.C. §§ 405(g) and 1383(c)(3). Plaintiff seeks review, and remand, of the Commissioner's decision that Plaintiff was not disabled and therefore not entitled to Disability Insurance Benefits ("DIB") from January 14, 2021, her alleged onset date of disability, to March 31, 2023, the last date of Plaintiff's insured status. The Commissioner cross-moved for judgment on the pleadings, asking the Court to affirm the Commissioner's decision and dismiss the action. For the reasons explained below, Plaintiff's motion should be GRANTED, and the Commissioner's motion should be DENIED.

## APPLICABLE LAW

### A.    Standard Of Review

A district court may affirm, modify, or reverse (with or without remand) a final decision of the Commissioner. 42 U.S.C. § 405(g); *Skrodzki v. Commissioner of Social Security Administration*, 693 F. App'x 29 (2d Cir. 2017) (summary order). The inquiry is

"whether the correct legal standards were applied and whether substantial evidence supports the decision."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004); *accord Talavera v. Astrue,* 697 F.3d 145, 151 (2d Cir. 2012).

"Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations."  *Douglass v. Astrue*, 496 F. App'x 154, 156 (2d Cir. 2012) (summary order) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (Sotomayor, J.) (remanding for noncompliance with regulations)).  Courts review de novo whether the Administrative Law Judge ("ALJ") applied the correct legal principles and made legal conclusions based on those principles. *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) (reversing when the court could not "ascertain whether [the ALJ] applied the correct legal principles … in assessing [plaintiff's] eligibility for disability benefits"); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (reversing where the Commissioner's decision "was not in conformity with the regulations promulgated under the Social Security Act"); *Thomas v. Astrue*, 674 F. Supp.2d 507, 530 (S.D.N.Y. 2009) (reversing for legal error after de novo consideration).

If the reviewing court is satisfied that the ALJ applied the correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision."  *Brault v. Social Security Administration, Commissioner*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Richardson v.*

2

*Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420 (1971)); *accord Biestek v. Berryhill*, 587 U.S. 97, 102-03, 139 S. Ct. 1148 (2019). "The substantial evidence standard means once an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (internal quotation marks omitted); *see also* 42 U.S.C. § 405(g) ("findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive").

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record." 42 U.S.C. § 423(d)(5)(B). The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based." 42 U.S.C. § 405(b)(1). While the ALJ's decision need not "mention[ ] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability. *See Ericksson v. Commissioner of Social Security*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler*, 546 F.3d at 268-69 (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01-CV-1120, 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence).

Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982). The court affords the Commissioner's determination considerable deference and "may not substitute its own judgment for that of the [Commissioner], even

3

if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Secretary of Health and Human Services*, 733 F.2d 1037, 1041 (2d Cir. 1984)); *see also Dunston v. Colvin*, No. 14-CV-3859, 2015 WL 54169, at *4 (S.D.N.Y. Jan. 5, 2015), *R. & R. adopted*, 2015 WL 1514837 (S.D.N.Y. April 2, 2015). Accordingly, if a court finds that there is substantial evidence supporting the Commissioner's decision, the court must uphold the decision, even if there is also substantial evidence for the claimant's position. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). "The Court, however, will not defer to the Commissioner's determination if it is the product of legal error." *Dunston*, 2015 WL 54169, at *4 (citing cases) (internal quotation marks omitted).

## B.    Determination Of Disability

Under the Act, a person meeting certain requirements and having a disability is entitled to disability benefits. 42 U.S.C. § 423(a)(1). The Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether an individual is disabled and therefore entitled to benefits, the Commissioner conducts a five-step sequential analysis. 20 C.F.R. § 404.1520(a)(1).

4

First, the Commissioner determines whether the claimant is currently engaged in any substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i), (b). If so, the claimant is not eligible for benefits and the inquiry ceases.

If the claimant is not engaged in any such activity, the Commissioner proceeds to the second step and must determine whether the claimant has a severe impairment, which is an impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii), (c). If the claimant does not have an impairment or combination of impairments that are severe, the claimant is not entitled to benefits, and the inquiry ends.

If the claimant has a severe impairment or combination of impairments, the Commissioner continues to step three and must determine whether the impairment or combinations of impairments are, or medically equal, one of the impairments included in the "Listings" of the regulations contained at 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment or impairments meet or medically equal one of the Listings, the Commissioner will presume the claimant to be disabled, and the claimant will be eligible for benefits. 20 C.F.R. § 404.1520(a)(4)(iii), (d).

If the claimant does not meet the criteria for being presumed disabled, the Commissioner continues to step four and must assess the claimant's residual functional capacity ("RFC"), which is the claimant's ability to perform physical and mental work activities on a sustained basis, despite their impairments. In formulating the RFC, the ALJ must consider all relevant medical and other evidence, including any statements about what the claimant can or cannot do provided by any medical sources. 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c). The Commissioner then determines whether the

claimant possesses the RFC to perform the claimant's past work. 20 C.F.R. § 404.1520(a)(4)(iv), (f), (h). If so, the claimant is not eligible for benefits, and the inquiry stops.

If the claimant is not capable of performing prior work, the Commissioner must continue to step five and determine whether the claimant is capable of performing other available work. 20 C.F.R. § 404.1520(a)(4)(v), (g), (h). If the claimant, as limited by his RFC, can perform other available work, the claimant is not entitled to benefits. 20 C.F.R. § 404.1520(a)(4)(iv), (v). The claimant bears the burden of proof for the first four steps. *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013). Once the claimant has established that he or she is unable to perform their past work, however, the Commissioner bears the burden of showing at the fifth step that "there is other gainful work in the national economy which the claimant could perform." *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (internal quotation marks and citation omitted).

## FACTUAL AND PROCEDURAL BACKGROUND

### A.    Plaintiff's Claim

Plaintiff was born on September 26, 1979. (*See* R. 285.[1]) She is a high school graduate and last worked as a Director of Admissions at a nursing home. (R. 304.) In 2017, she had surgery to remove a meningioma,[2] after which she stopped working due

---

[1] "R." refers to the Certified Administrative Record filed on January 16, 2025, at Dkt. 7.

[2] See *Meningiomas*, AMERICAN ASSOCIATION OF NEUROLOGICAL SURGEONS (April 8, 2024), https://www.aans.org/en/Patients/Neurosurgical-Conditions-and-Treatments/Meningiomas ("Meningiomas are the most common benign intracranial tumor … Although the majority of meningiomas are benign, these tumors can grow slowly until they are very large, if left undiscovered, and, in some locations, can be severely disabling and life-threatening").

to depression and anxiety.  (R. 112-13.)  Since then, she has reported experiencing a number of additional afflictions, including persistent migraine headaches and nausea, vertigo, sensitivity to light and sound, neuropathy,[3] radiculopathy,[4] Raynaud's syndrome,[5] carpal tunnel syndrome,[6] a left shoulder tear, and difficulty with her right knee.  (*See* R. 20, 337, 551, 565.)  She has a second, smaller meningioma tumor, although it has been assessed as relatively stable, unrelated to Plaintiff's symptoms, and subject to annual monitoring.  (R. 510.)

Plaintiff has filed three applications for disability benefits.  She first applied and was approved for benefits by ALJ Denise M. Martin for the period of July 26, 2017, through July 31, 2018.  (R. 109-23.)  She next applied for disability benefits on September 20, 2019, alleging a disability beginning on August 1, 2018.  That claim was denied.  (R. 131-42.)  On June 24, 2022, Plaintiff filed the claim at issue, alleging disability since January 14, 2021.  (R. 285-88.)  The Administration denied that claim, as well. (R. 170-71.)  Plaintiff requested a hearing, which was held telephonically before ALJ Michael J.

---

[3] Neuropathy is a general term that denotes "any disorder affecting any segment of the nervous system." *Neuropathy*, STEDMAN'S MEDICAL DICTIONARY 601870 (Nov. 2014).  *See Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 262 n.1 (2d Cir. 2002).

[4] Radiculopathy refers to a "[d]isorder of the spinal nerve roots."  *See Johnston v. Commissioner of Social Security*, No. 23-CV-5054, 2024 WL 3442664, at *3 n.6 (S.D.N.Y. July 17, 2024) (citing *Radiculopathy*, STEDMAN'S MEDICAL DICTIONARY 748650 (Nov. 2014)).

[5] "Raynaud's is a syndrome in which blood vessels in one's fingers overreact to cold temperatures or stress." *Reid v. Berryhill*, No. 18-CV-255, 2018 WL 8545835, at *1 n.1 (S.D.N.Y. Dec. 20, 2018), *R&R adopted*, 2019 WL 1284275 (S.D.N.Y. Mar. 20, 2019).

[6] Carpal tunnel syndrome is a condition caused by "chronic entrapment of the median nerve at the wrist within the carpal tunnel" which is "characterized by paresthesias … and sometimes sensory loss." *Carpal Tunnel Syndrome*, STEDMAN'S MEDICAL DICTIONARY, 877830 (Nov. 2014).

Stacchini on December 1, 2023.  (R. 212, 237; *see* R. 65-104.)  The ALJ denied Plaintiff's claim on February 1, 2024.  (R. 15-33.)  The Appeals Council denied Plaintiff's request for review on September 17, 2024.  (R. 1-7.)

On November 15, 2024, Plaintiff filed the instant action seeking review and requesting remand.  (Dkt. 1.)  The parties have fully briefed their cross motions for judgment on the pleadings.  (Dkts. 15, 20, 21.)  The case has been referred to me for report and recommendation.  (Dkt. 6.)

**B.    Medical Record[7]**

The medical records span from approximately December 2018 to December 2023. In general, the record demonstrates stable objective evidence with respect to Plaintiff's meningioma; emergence, continuation, and fluctuation of varied afflictions and symptoms reported by Plaintiff; regular Botox injections for  migraine headaches; and varied findings by Plaintiff's primary care doctor starting in early 2021 and continuing through 2023.

Plaintiff saw Dr. Katharine McNeill, MD., a neurologist, for assessment after the surgical removal of her tumor in September 2017.  (R. 400.) In December 2018, treatment notes reflect Plaintiff having reported a number of continuing symptoms since surgery, including, "pain around her right wrist and headaches every morning, burning pain localized to her right heel, and most recently, forgetfulness and anxiety."  (R. 400.)  In June 2019, Plaintiff followed up with Dr. McNeill, who noted continued headaches, poor appetite, bilateral hand swelling, right foot numbness, sleep disturbance, and anxiety.  (R. 419-21.) In September 2019, Dr. McNeill noted Plaintiff's complaints of worsening chronic daily headaches, intermittent hand and feet swelling, and worsening anxiety and

---

[7] The description of the medical record presented here is summary and exemplary only.

depression since discontinuing Lexapro and Gabapentin due to side effects. (R. 447-48.) Plaintiff also complained of fatigue, diarrhea, back pain, trouble walking, dizziness, weakness, numbness, sleep problems and anxiety. (R. 449.)

In June 2020, Dr. McNeill recorded Plaintiff's complaints of worsening headaches since March 2020, causing Plaintiff to be "in a bed for a week" before each month of her menstrual cycle; photophobia and phonophobia;[8] and blurred vision in her left eye. (R. 481.) According to Plaintiff, various medications made her sleepy or dizzy. (R. 481.) Dr. McNeill's December 2020 treatment notes report Plaintiff's complaints of "a lot of dizziness and nausea," including when Plaintiff turned her head while driving to check her blind spot; "bad anxiety" with accompanying chest pains; and headaches that "feel[] like sinus pressure." (R. 498-99.)

During 2021, Plaintiff saw various doctors, including her primary care physician, Dr. Gary Rogg, MD., primarily, although not only, for sinus infections and recurring headaches. (R. 807-42.); Dr. McNeill, who noted worsening migraine headaches since Plaintiff got a dog; and neurologist Dr. Jin Li, MD., who prescribed renewed Botox injections (R. 830, 833-36, 843-44).

In January and February 2022, Plaintiff reported to Dr. McNeill that, among other symptoms, she was "not sleeping well" in part due to right leg pain and had increased anxiety and irritability, ongoing migraines, Raynaud's symptoms of tingling and purple fingers, vertigo, and some nausea tied to her anxiety. (R. 796, 799.) Plaintiff's anxiety

---

[8] "Photophobia, or photalgia, refers to '[l]ight-induced pain, especially of the eyes.'" *Anair v. Colvin*, No. 2:14-CV-169, 2015 WL 5089316, at *6, n.3 (D. Vt. Aug. 26, 2015) (quoting STEDMAN'S MEDICAL DICTIONARY 1489, 1490 (28th ed. 2006)). "Phonophobia refers to abnormal sensitivity to noise, a common feature of migraine headaches." *Fontanez v. Colvin*, No. 16-CV-1300, 2017 WL 4334127, at *3 n.6 (E.D.N.Y. Sept. 28, 2017).

9

and depression improved somewhat with a prescription of Citalopram. (R. 799.) However, she still felt anxious and irritable, which was made worse by her cousin have moved in temporarily. (R. 801.) In June 2022, Dr. McNeill recommended that Plaintiff double her dosage of Citalopram, but Plaintiff declined due to concerns that it would worsen her fatigue. (R. 511.) Plaintiff's anxiety worsened and was not relieved by taking Celexa; she nevertheless expressed reluctance in response to Dr. McNeill's suggestion of talk therapy. (R. 533.) Dr. Rogg's treatment notes are variable, regularly reporting sinus problems and concomitant problems such as headaches. (R. 845-72.)

In October 2022, Dr. Rogg assessed Plaintiff with "chronic" headaches as well as cervical radiculopathy and knee pain, the last for which he prescribed Voltaren gel. (R. 868.) The following month, Plaintiff complained of episodic knee pain. (R. 870.) And in December 2022, Dr. Rogg noted Plaintiff as having "moderate" nausea. Dr. Rogg assessed GERD, recurrent sinus congestion, and pain in Plaintiff's abdomen. (R. 876-78.) Plaintiff continued to receive quarterly Botox injections from Dr. Li. (R. 849-50, 857-58, 864-65, 873-74).

In March 2023, x-rays revealed mild scoliosis, and an MRI of Plaintiff's left shoulder showed some degenerative changes, a surface tear, and trace bursitis. (R. 713-14, 715-16.) Dr. Rogg prescribed physical therapy for the shoulder, which Plaintiff participated in from late March to early June. (R. 732-76.) At her first physical therapy session, Plaintiff indicated, among other things, that her shoulder pain posed "severe difficulty" with tasks such as doing heavy chores and recreational activities, that the pain had moderately interfered with her social activities, and that the pain prevented her from sleeping. (R. 721.) By April 11, 2023, Plaintiff reported that her shoulder felt better and that she could

10

sleep.  (R. 750.)  At her last physical therapy appointment on June 6, 2023, Plaintiff reported that "she felt good over the[e] weekend" although it was "uncomfortable when she tries to lift heavier objects."  (R. 775.)

In June 2023, a left-knee x-ray showed calcium build-up indicative of arthritis.  (R. 778-79.)  Dr. Rogg noted continuing migraines and photophobia.  (R. 806.)  In July 2023, an ear, nose, and throat doctor diagnosed Plaintiff as having chronic rhinitis, post-nasal drip, and vertigo.  (R. 925-26.)  In November and December 2023, Plaintiff presented with bilateral hand pain, assessed as carpal tunnel syndrome, for which Dr. Rogg prescribed wrist splints and Voltaren gel, and cervical radiculopathy, for which Dr. Rogg prescribed physical therapy.  (R. 948.)  Plaintiff continued to receive periodic Botox injections from Dr. Li throughout 2023.  (*See* R. 895-96, 911-12, 933-34, 943-44.)

## C.    Medical Opinions

There are medical source opinions from Plaintiff's primary care physician, Dr. Rogg; two consultative examiners; and four State Agency medical and psychological medical consultants. Of note, the four State Agency consultants reviewed incomplete medical records and did not examine Plaintiff.

### 1.    Treating Doctor

On April 5, 2022, **Dr. Rogg** authored a "To Whom It May Concern" letter.  (R. 789.) In that letter, Dr. Rogg noted Plaintiff's surgery for tumor removal, "residual recurrent headaches that recur unpredictably to medication," and "evidence of a new tumor."  (R. 789.)  Dr. Rogg further stated that medications help Plaintiff somewhat, but cause her sedation and nausea; that Plaintiff experiences anxiety and panic despite medication;

11

that she is "unable to engage in interpersonal reactions"; that she cannot focus and needs frequent breaks and bedrest such that "she cannot work." (R. 789.)

On December 8, 2023, approximately nine months after the last-insured date, Dr. Rogg completed a medical source statement using the Administration's check-the-box form. (R. 952-57.) Dr. Rogg opined that Plaintiff was restricted to lifting/carrying no more than 10 pounds occasionally, that she could sit and stand for 10 minutes at a time, and that she could walk 5-10 minutes at a time. (R. 952-53.)  Spread across an eight-hour workday, Dr. Rogg opined that Plaintiff would only be able to sit, stand, and walk for 80 minutes total, respectively, per day. (R. 952-53.) He based this assessment on Plaintiff's "multiple meningiomas," as well as her prior neurosurgery to remove the largest tumor, back pain–lumbar radiculopathy, and neuropathy. (R. 953.)

Dr. Rogg further opined that Plaintiff was limited to occasional fingering and reaching in all directions but that she could not handle items, feel anything with her hand, or push or pull anything with her dominant right hand. (R. 954.) Plaintiff was not able to operate foot controls, and could not climb stairs and the like, balance, kneel, crawl, or crouch. (R. 954-55.) Dr. Rogg advised that due to Plaintiff's vision impairments, she was unable to avoid ordinary workplace hazards or read very small print, and had limited ability to view a computer screen. (R. 955.) Dr. Rogg further opined that Plaintiff needed to avoid unprotected heights, moving mechanical parts, humidity/wetness, pulmonary irritants, extreme temperatures, and vibrations, and limited her to only occasionally operating a car. (R. 956.) He also noted that Plaintiff cannot walk a block at a reasonable pace on rough/uneven surfaces, cannot use public transportation, and cannot sort,

12

handle, or use paper/files due to hand-cramping.  (R. 957.)  Finally, Dr. Rogg indicated that Plaintiff's limitations lasted or will last for at least 12 consecutive months.  (R. 957.)

### 2. Consulting Examiners

In July 2022, the Administration determined that a consultative examination was needed because, as of then, "[t]he evidence as a whole, both medical and non-medical, is not sufficient to support a decision on the claim."  (R. 158.)

Accordingly, Plaintiff was examined by **David Schaich, Ph.D.**, on August 21, 2022. (R. 541-45.)  Dr. Schaich noted Plaintiff's reported symptoms including difficulty sleeping, loss of appetite, dysphoric mood, loss of energy, concentration problems, irritability, crying spells, feelings of worthlessness/guilt, diminished sense of pleasure, social withdrawal, worry, apprehension, restlessness, being easily fatigued, palpitations, sweating, trembling, chest pain, and breathing difficulty.  (R. 541-42.)  Dr. Schaich also noted Plaintiff's reported mild cognitive deficits including short-term and long-term memory problems, difficulty reading, and word-finding difficulties. (R. 542.)  Dr. Schaich also reported that Plaintiff could dress, bathe, and groom herself, cook and prepare food, clean, shop and do her own laundry, and drive.  (R. 543.)  He noted that Plaintiff "socializes little" but that her family relationships are okay.  (R. 543.)

On examination, Dr. Schaich observed an anxious mood and affect.  (R. 542.)  He assessed Plaintiff's manner of relating, social skills, and overall presentation as "fair."  (R. 542.)  Plaintiff's insight and judgment were also "fair."  (R. 543.)  Plaintiff's attention and concentration were determined to be "intact" as were her recent and remote memory skills.  (R. 543.)  Dr. Schaich diagnosed Plaintiff with major depressive disorder, generalized anxiety disorder, and panic disorder; gave a "[g]uarded" prognosis; and

recommended psychological therapy and cognitive rehabilitation. (R. 544.) With respect to functional capacity, Dr. Schaich assessed Plaintiff as having no limitations in her ability to understand, remember, and apply either simple or complex directions and instructions. (R. 543.) She did, however, have marked limitations in her ability to use reason and judgment to make work-related decisions; her ability to interact adequately with supervisors, coworkers, and the public; her ability to sustain concentration and perform tasks at a consistent pace; her ability to sustain an ordinary routine and regular attendance at work; and her ability to regulate emotions, control behaviors, and maintain well-being. (R. 543-44.) Dr. Schaich also wrote that "the results of the examination appear to be consistent with psychiatric problems that may significantly interfere with [Plaintiff's] ability to function on a daily basis." (R. 543.)

A few months later on October 24, 2022, Plaintiff was examined by **Julia Kaci, M.D.** (R. 551-54.) Dr. Kaci noted a history of surgical removal of a meningioma, with a new tumor in the right parietal area. She noted Plaintiff's complaints of daily migraine headaches, which she experiences at a pain level of 8 to 10 on a 10-point scale, with associated photophobia, phonophobia, nausea, and vomiting; constant fatigue; vertigo; trouble focusing; short-term memory loss; mood swings; severe anxiety; and intermittent tingling in her right arm. (R. 551.) Plaintiff reported "[e]very time she moves her head … she feels dizzy and nauseous." (R. 551.) Dr. Kaci further noted that Plaintiff cooks three to four times a week, cleans twice a week, does laundry and shopping once a week, socializes with friends and goes out to visit relatives. (R. 552.)

On examination, Dr. Kaci noted difficulty walking heel-toe, with pain in Plaintiff's right heel; Plaintiff's inability to recall three words after five minutes; and slightly

14

diminished strength in the extremities.  (R. 552-53.)  She diagnosed brain meningioma, recurrent; migraine headaches; benign paroxysmal positional vertigo;[9] memory loss; trouble focusing; adenomyosis;[10] chronic fatigue; Raynaud's syndrome; mood swings; overactive bladder; anxiety; and neuropathy.  Dr. Kaci opined that, based on the exam, Plaintiff "needs to avoid bright lights" and "noisy environments because of her headaches"; she "needs to avoid activities that require neck turns because of the vertigo"; she "has moderate limitations to walking, climbing stairs" and "[m]ild limitations to lifting, carrying, pushing, pulling." (R. 553-54.)

### 3.    Non-Examining Consultants

Four state agency consultants provided opinions for purposes of administrative medical findings.  None of those consultants examined Plaintiff, and the medical records they reviewed were incomplete.  Two of the consultants addressed Plaintiff's mental health limitations, and two addressed her physical limitations.

On September 14, 2022, **P. Fernandez, Ph.D.**, opined that Plaintiff's depression and anxiety were "non-severe" and her limitations only "mild." (R. 159-60.) Dr. Fernandez opined that Dr. Schaich's marked-limitation findings were "too restrictive" given "other evidence in the file" and Dr. Schaich's "unremarkable" examination of Plaintiff.  (R. 160.) Other evidence cited by Dr. Fernandez included Plaintiff's statement on her self-

---

[9] "Benign paroxysmal positional vertigo is 'recurrent vertigo and nystagmus occurring when the head is placed in certain positions.'" *Elliott v. Saul*, No. 3:19-cv-01439, 2020 WL 13994904 at *5 n.19 (D. Conn. Aug. 24, 2020) (quoting *Benign Paroxysmal Positional Vertigo Definition*, MOSBY'S MEDICAL DICTIONARY (7th ed. 2006) at 204).

[10] Adenomyosis, or adenomyosis uteri, "is a benign invasion of myometrium by endometrial tissue.  *Adenomyosis uteri*, STEDMAN'S MEDICAL DICTIONARY 11970 (Nov. 2014).

completed adult-function report that she gets along with authority; that Plaintiff could complete her daily activities without substantial limitations; and that despite having some difficulty regulating her emotions, Plaintiff found some improvement with medications.  (R. 160.)  On May 19, 2023, **Y. Sherer, Psy.D.**, reviewed the file and noted Plaintiff's having reported worsening of all symptoms, and the absence of any additional medical records pre-dating the last-insured date (March 31, 2023).  (R. 174-76.)  Dr. Sherer summarily found that "[t]he prior determination was substantively and technically correct" and "affirmed" Dr. Fernandez's earlier assessment. (R. 174.)

On October 27, 2022, **T. Schmidt-Deyoung, M.D.**, reviewed Plaintiff's records and opined that Plaintiff was limited to lifting/carrying up to 10 pounds frequently and up to 20 pounds occasionally; sitting or standing and/or walking up to six hours per day; never climbing ladders/ropes/scaffolds; occasionally climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; avoiding concentrated noise, concentrated vibrations, and moderate exposure to hazards. (R. 163-65.)  On May 22, 2023, **J. Sharif-Najafi, M.D.**, noted the absence of any additional medical records in the file prior to the last-insured date and summarily "affirmed" Dr. Schmidt-Deyoung's earlier assessment.  (R. 178.)

All four non-examining consultants based their opinions on a materially incomplete medical record.  There are 21 medical record exhibits in the file, numbered C1F through C22F.  (Dkt. 7 at ECF 2-4 (transcript index and exhibit list).)  Some of those exhibits only contain a single page (e.g., C13F), while others have more than a hundred pages consisting of medical records from numerous treatment dates (e.g., C21F).   Dr. Fernandez's opinion is dated September 15, 2022, thus limiting Dr. Fernandez's review

to only exhibits C1F through C6F.  Dr. Schmidt-Deyoung opined on October 27, 2022, having only reviewed exhibits C1F through C9F.  Drs. Sherer and Sharif-Najafi gave their opinions on May 19, 2023, and May 22, 2023, respectively.  Both doctors noted in their reviews that there were no additional records in the evidentiary file pre-dating the last-insured date of March 31, 2023.  (R. 175, 178.)  In other words, the record they reviewed was virtually the same as that reviewed by Drs. Fernandez and Schmidt-Deyoung in the prior year – the one exception being that Dr. Sherer noted Plaintiff's report sharing the worsening of her symptoms.  (R. 175.)

Accordingly, none of the non-examining consultants reviewed exhibits C15F through C22F.  Some of those exhibits contain records post-dating their opinions.  And two exhibits – C20F and C21F – contain a host of medical treatment records ***pre-dating*** their opinions.  Those records include treatment notes from four of Plaintiff's visits with Dr. McNeill in July 2021 and January, February, and April 2022.  (*See* R. 793-802.)  They also include ***all*** of Dr. Rogg's treatment records, which span more than 20 visits from February 10, 2021 through December 8, 2023.  (*See* R. 807-949.)  Neither exhibit C20F nor exhibit C21F was part of Plaintiff's file until ***after*** the hearing with the ALJ held on December 1, 2023.  (*See* R. 72-73 (ALJ moving exhibits 1A through 19F into evidence); R. 70-72 (discussing records not yet received).)

## D.    Hearing Testimony

Two witnesses testified at the hearing:  Plaintiff, and a Vocational Expert ("VE"), Joseph Atkinson.

17

### 1.   Plaintiff's Testimony.[11]

Plaintiff lives with her husband and has an emotional support dog; she has no children.  (R. 73-74.)  She has a good relationship with her family, and a friend who visits her about once a week.  (R. 74-75.)  She performs light chores, including sweeping, laundry, preparing light meals, and other household tasks that do not require her to bend.  (R. 76-78.)  She shops at the corner store for "light stuff" but needs her husband to accompany her if she is buying anything heavy.  (R. 78.)  She does not take public transportation, but occasionally drives to go to doctor appointments or to visit her mother.  (R. 78, 86.)  She watches television at home and browses on the computer, although sometimes she loses concentration and "zone[s]" out.  (R. 79, 92.)  Plaintiff testified to her struggles with memory and concentration, stating that she forgets to take her medication "all the time" and that she will "go[] from one room to the next not realizing what [she] was doing."  (R. 93.)  She also described regular instances of her leaving the house with the stove still on, or leaving the door to her house open.  (R. 92.)

Plaintiff shared her frustration over her inability to do light exercise, such as walking.  (R. 79-80.)  She gets Botox injections every three months, and is prescribed medication for her headaches.  (R. 82)  However, even with those treatments, she gets headaches "every day" and describes them as "constant."  (R. 83.)  When asked about potential triggers, she responded "[a]nything" can make her headaches feel worse.  (R. 94.)  She doesn't sleep well, and, for the last two years, her headaches have caused her to throw up every morning.  (R. 82-83.)  She has neuropathy in her right foot, which she

---

[11] The hearing transcript indicates that Plaintiff appeared in person.  (R. 67.)  The ALJ's decision, however, states that "[a]ll participants attended the hearing by telephone."  (R. 18.)

treats with Voltaren.  (R. 83-84.)  Her left shoulder "pops" when she raises her arm over her head – even after being discharged from physical therapy.  (R. 84.)  She is unable to bend all the way down, which she attributes to either arthritis or bursitis in her knees.  (R. 85.)  She experiences "very bad cramping" in her hands if she holds something, such as a utensil or a pen, longer than a minute.  (R. 94.)  Due to vertigo, she gets dizzy if she changes positions too quickly, including when she twists her neck.  (R. 85-86.)  While she can briefly stand, after about 5-7 minutes she experiences an "excruciating burning pain" on her right side, forcing her to sit down.  (R. 86-87, 93.)  She cannot sit up straight, and can sit still for about 10 minutes before having to move.  (R. 93-94.)

Plaintiff initially stated that she no longer takes medication for her anxiety and/or depression, as she does not think it works.  (R. 87.)  She does take Klonopin on an as-needed basis but tries not to because of its sedating effect.  (R. 87.)  When asked if she had explored other medication, she said that Lexapro gave her "horrible nightmares and made [her] depression worse."  (R. 87.)  She is prescribed her medication by her primary care physician, Dr. Rogg.  (R. 88.)  She does not currently see a psychiatrist.  (R. 88.)  When asked about the impact of anxiety and depression on her ability to work, she said "some days I don't even feel like getting out of bed … some days I wish I wasn't even here."  (R. 91.)

### 2.    Vocational Expert

The VE described Plaintiff's past work as semi-skilled and classified Plaintiff's past work as an Admissions Clerk: DOT code 205.362-018;   sedentary, [12] medium as

---

[12] "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary

performed, with an SVP of 4.[13] (R. 96.)  The ALJ posed a hypothetical to the VE of a person able to perform sedentary work who is limited to: frequent foot controls; occasionally climbing ramps/stairs; balancing, stooping, kneeling, crouching, and crawling; never climbing ropes/scaffolds/ladders; frequent rotation of the neck, reaching, handling, and fingering; needs to avoid unprotected heights/hazards and excessive vibration; moderate sound and lighting; and is able to understand, remember, and carry out simple, routine, repetitive tasks throughout a regular eight-hour work day with regular breaks provided at two-hour intervals. (R. 97.)  The VE opined that those limitations preclude Plaintiff's past work, but would still allow work as a Document Preparer (15,628 positions nationally); Addresser (2,065 positions); or Charge Account Clerk (1,033 positions) – all sedentary jobs with an SVP of 2.[14] (R. 97.)

The job positions to which the VE testified are those listed in the Dictionary of Occupational Titles ("DOT"). The VE testified, based on his experience, that the

---

job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met."  20 C.F.R. § 416.967(a).

[13] "An SVP is the amount of time required for a typical claimant to '[l]earn the techniques, [a]cquire the information, and [d]evelop the facility needed for average performance in a job.'"  *Valderrama v. Commissioner of Social Security*, No. 22-CV-8287, 2024 WL 3887161, at *3 (S.D.N.Y. Aug. 21, 2024) (quoting Social Security Administration Program Operation Manual System DI 25001.001A.77, available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0425001001#a77 (visited Dec. 11, 2025)) (alteration in original).

[14] "An SVP of two means that 'it takes anything more than a short demonstration, and potentially up to thirty days, to learn a job.'"  *Laing v. Commissioner of Social Security*, No. 15-CV-7764, 2017 WL 934715, at *7 (S.D.N.Y. Mar. 9, 2017) (quoting *Rodriguez v. Astrue*, No. 07-CV-534, 2009 WL 637154, at *10 n.23 (S.D.N.Y. Mar. 9, 2009).

Document Preparer occupation now relates to scanning rather than microfilming documents, but opined that it remained a sedentary, unskilled job. (R. 97.) He also opined that an Addresser job now uses a computer instead of a typewriter. (R. 98.) When the ALJ modified his hypothetical to limit the worker to only occasional interaction with the public, the VE opined Plaintiff could not work as a Charge Account Clerk, but could work as a Polisher (1,157 positions), another sedentary role with an SVP of 2. (R. 98.)

The VE testified to several limitations that would preclude all work. He opined that a limit of four hours sitting and one hour standing/walking would preclude all work. (R. 98.) Additionally, time off-task in excess of 10 percent of the day (or six minutes per hour) would preclude all work, as would more than one absence from work per month. (R. 99-100.) An individual with the above restrictions who was only occasionally able to stay on task would also be precluded from work, as would an individual who was limited to working in a quiet environment or a dark room. (R. 100-01.) While avoiding any overhead reaching with the left arm would not preclude any of the VE's identified occupations, restrictions on even occasional reaching, handling, and fingering would eliminate all of the jobs the VE identified. (R. 102.)

## E.   The ALJ's Decision

### 1.   The ALJ's Sequential Analysis

Following the five-step sequential evaluation set forth in the applicable regulations, the ALJ first determined that Plaintiff had not engaged in substantial gainful activity from January 14, 2021, the alleged onset day, through March 31, 2023, her last insured date. (R. 20.) At step two, the ALJ found that Plaintiff suffered from several severe impairments, including anxiety disorder, depressive disorder, meningioma, migraine headaches,

21

Raynaud's syndrome, carpal tunnel syndrome, benign proximal vertigo, peripheral neuropathy, mild scoliosis, partial tear of the left shoulder, knee chondrocalcinosis,[15] and cervical radiculopathy. (R. 20.) However, at step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 21-24.)

The ALJ then assessed Plaintiff's RFC and determined that she could perform sedentary work with the following limitations: she can frequently use foot controls, with occasional climbing ramps and stairs, but she cannot use ladders, ropes, or scaffolds; she can occasionally balance, stoop, kneel, crouch, or crawl; and she can frequently rotate the neck, reach, handle, and finger; she must avoid excessive vibration, unprotected heights, and hazardous machinery; she is limited to moderate noise and lighting levels; and, she can understand, remember, and carry out simple tasks throughout an eight-hour work day, with regular breaks at two-hour intervals. (R. 24.)

At step four, the ALJ found that Plaintiff could not perform her previous work. (R. 31.) At step five, relying on the VE's testimony, the ALJ determined that through the date last insured, there were jobs that existed in significant numbers in the national economy that Plaintiff could perform, including document preparer, addresser, and charge account clerk. (R. 32.) The ALJ acknowledged, based on the VE's testimony, that the document preparer and addresser jobs are performed differently now than as describe in the DOT,

---

[15] "Chondrocalcinosis is defined as the presence of calcium salts, especially calcium pyrophosphate in the cartilaginous structures of one or more joints." *Key v. Commissioner of Social Security*, No. 13-CV-364, 2014 WL 1338311, at *5 n.8 (E.D.N.Y. Mar. 31, 2014) (citing DORLAND'S ILLUSTRATED MEDICAL DICTIONARY (32nd Ed. 2012)).

but those differences do not change Plaintiff's ability to perform those jobs.  (R. 32.)

Accordingly, the ALJ concluded that Plaintiff was not disabled under the Act from the

alleged onset date through the date last insured.  (R. 32.)

### 2.    The ALJ's Assessment Of Plaintiff's Symptoms And The Medical Source Opinions

In formulating Plaintiff's RFC, the ALJ reviewed Plaintiff's medical history, noting

in particular her history of meningioma, headaches, back pain, right foot pain, left shoulder

difficulty, the medications and treatments received, and findings by the doctors who

examined Plaintiff both during the course of treatment and in a consultative capacity.  (R.

24-28.)  The ALJ also considered Plaintiff's reported symptoms and found that although

Plaintiff's medically determinable impairments could reasonably be expected to cause the

alleged symptoms, her statements concerning the intensity, persistence, and limiting

effects of those symptoms were not fully supported by the objective medical evidence

and other evidence in the record.  (R. 25-28.)

In that regard, the ALJ noted that Plaintiff "described daily activities, which are not

limited to the extent one would expect, given the complaints of disabling symptoms and

limitations."  (R. 28.)  The ALJ referenced Plaintiff's independent personal care, ability to

drive locally, shopping for light items, preparing simple meals, and doing light cleaning.

(R. 28.)  He also referenced Plaintiff's driving as demonstrating Plaintiff's ability to use

hand and foot controls, as well as her ability to turn her head to consult mirrors, to sit for

a continuous period for time, and to bend and stoop to get in and out of the car.  (R. 28.)

Additionally, the ALJ described examples where the medical record did not support

Plaintiff's assertions.  Among others, he noted that the second meningioma is small and

only requires monitoring; that in examinations Plaintiff was found to be alert and oriented

with intact concentration on exams; and that examinations also showed that she has a normal gait and does not require an assistive device. (R. 28.) The ALJ also noted that the record reflected only "occasional nausea" that was not consistent with Plaintiff's testimony to her daily vomiting and other "extreme symptoms" alleged at the hearing. (R. 28.)

The ALJ also evaluated the persuasiveness of each medical opinion of record. The ALJ first addressed the opinions concerning Plaintiff's physical limitations. He found the opinions of the non-examining consultants, Drs. Schmidt-Deyoung and Sharif-Najafi, "partially persuasive." (R. 28.) The ALJ reasoned that the opinions are consistent with the treatment notes and examination of Plaintiff's treating Drs. Li and Rogg, as well as consultative examiner Dr. Kaci. (R. 28.) The ALJ also noted the consistency between the two non-examining consultants' opinions, as well as their consistency with Plaintiff's "conservative course of treatment" and daily activities. (R. 28-29.) However, the ALJ rejected the opinion of Drs. Schmidt-Deyoung and Sharif-Najafi that Plaintiff could perform "light" work, drawing on Dr. Kaci's finding that Plaintiff has moderate limits in walking and some reduced strength in the extremities. (R. 28-29.) The ALJ therefore limited Plaintiff to performing "a range of sedentary work." (R. 29.)

The ALJ found Dr. Kaci's opinion "mostly persuasive." (R. 29.) The ALJ endorsed Dr. Kaci's findings that Plaintiff has physical limitations ranging from moderate to mild, and needs to avoid bright lights and noisy environments. (R. 29.) The ALJ explained that those opinions were well supported by Dr. Kaci's own examination, and are consistent with some of Plaintiff's daily living activities and other examination records demonstrating that Plaintiff has an intact gait and no sensory abnormalities. (R. 29.) However, the ALJ

24

found unpersuasive Dr. Kaci's opinion that Plaintiff should avoid "all neck movement," which was inconsistent with Dr. Kaci's own examination and some of Plaintiff's daily activities, "such as driving." (R. 29.)

The ALJ found "unpersuasive the December 8, 2023 opinion of Plaintiff's primary care physician, Dr. Rogg. (R. 30.) Reasons given include that Dr. Rogg's opinion was rendered months after the last-insured date and was neither well-supported nor consistent with other evidence in the record. (R. 30.) The ALJ provided examples of medical evidence that were not consistent with Dr. Rogg's opinions, as well as examples from Dr. Rogg's own examinations of Plaintiff (i.e., normal gait, normal strength and motor examination, normal deep tendon reflexes, and normal sensation). (R. 30.) The ALJ also noted that Dr. Rogg's opinion was inconsistent with the opinions of consulting examiner Dr. Kaci and the agency's non-examining consultants. (R. 30.)

As for the psychological opinions, the ALJ again started with the agency's non-examining consultants, Drs. Fernandez and Sherer, finding them "partially persuasive" but "only to the extent they opine the claimant has no marked psychological limitations." (R. 29.) The ALJ otherwise found that Plaintiff's "mental medically determinable impairments, in combination with her migraines, do support that depression and anxiety are severe impairments and cause limitation on concentration." (R. 29.)

The ALJ found examining consultant Dr. Schaich's opinion "not persuasive." (R. 29.) According to the ALJ, Dr. Schaich's assessment of the Plaintiff as having several "marked" limitations was not supported by Dr. Schaich's own examination. In that respect, the ALJ noted that, per Dr. Schaich's examination, the Plaintiff drove herself to the doctor's office, had no problems relating or being cooperative, displayed normal

25

speech and thought processes, and had intact attention and concentration. (R. 29.) The ALJ further explained that Dr. Schaich's opinion as to marked limitations was not consistent with the findings of the non-examining consultants, and contradicted Plaintiff's reported daily activities. (R. 29.) The ALJ did, however, account for Dr. Schaich's notation of Plaintiff's "anxious mood." (R. 29.)

Lastly, the ALJ turned to Dr. Rogg's "To Whom It May Concern" letter (R. 789), making it clear that he did not find it persuasive.[16] (R. 30.) The ALJ found Dr. Rogg's opinion "completely inconsistent" with the opinions of the non-examining consultants, as well as Plaintiff's self-reported positive relationships with some members of her family, as well as her ability to "independently drive and shop." (R. 30.) The ALJ also noted Dr. Rogg's statement that Plaintiff "now has evidence of a new tumor," even though the "new" tumor had been detected on imaging several years earlier, was determined not to be causing any symptoms, and required only yearly surveillance. (R. 30.) The ALJ rejected Dr. Rogg's opinion that Plaintiff "cannot work" as "neither inherently valuable or persuasive" because that issue is reserved to the Commissioner. (R. 30.)

## DISCUSSION

Plaintiff argues that the ALJ committed three errors requiring remand: the ALJ failed to properly evaluate the medical experts' opinions; the ALJ improperly evaluated Plaintiff's subjective statements about her symptoms; and, the ALJ improperly relied on the VE's testimony opinion of available jobs, which was flawed due to its reliance on outdated and obsolete occupational information from the DOT. The Commissioner

---

[16] Although Dr. Rogg's letter was dated April 5, 2022 (R. 789), the ALJ's decision incorrectly recorded the date as April 5, 2023. (R. 30.)

26

counters that substantial evidence supports the ALJ's decision. Upon review, the Court agrees with Plaintiff that the ALJ erred in his assessment of the medical experts' opinions. In particular, the ALJ relied on the opinions of the four non-examining consultants, even though their findings relied on a materially incomplete record – a deficiency the ALJ neither discussed nor acknowledged. That error alone requires remand.

## A.   Evaluation Of The Medical Opinions

The ALJ erred in his assessment of the medical opinions. As a result, his determination of Plaintiff's RFC is not supported by substantial evidence.

### 1.   Legal Standards For Assessing Expert Opinions

The Administration requires ALJs to "evaluate every medical opinion [they] receive." 20 C.F.R. § 404.1527(c). All medical opinions must be assessed for persuasiveness considering their supportability and consistency and without presuming that one opinion carries more weight than another. 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) … including those from your medical sources").

While the most important factors for evaluating medical opinions are their supportability and consistency, 20 C.F.R. § 404.1520c(a), the ALJ also considers three other factors. The third factor is the relationship between the medical provider and the claimant, for which the ALJ must consider the (i) length of the treatment relationship, (ii) frequency of examinations, (iii) purpose of the treatment relationship, (iv) extent of the treatment relationship, and the (v) examining relationship (i.e., "A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder"). 20 C.F.R. § 404.1520c(c)(3)(v).

27

The fourth factor – specialization – requires the ALJ to account for whether the medical opinion is provided by a specialist that has advanced training in the area related to the medical issue.  20 C.F.R. § 404.1520c(c)(4).  The fifth factor is a catchall, and accounts for "other factors that tend to support or contradict a medical opinion or prior administrative medical finding."  20 C.F.R. § 404.1520c(c)(5).  That "includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of [the Administration's] disability program's policies and evidentiary requirements."  *Id.*

An ALJ must not only consider supportability and consistency in evaluating medical opinions but also must explain their analysis of those factors.  20 C.F.R. § 404.1520c(b)(2); *Vellone ex rel. Vellone v. Saul*, No. 20-CV-261, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021) ("an ALJ *must* explain his/her approach with respect to the first two factors when considering a medical opinion"), *R. & R. adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021) (emphasis in original).  The ALJ must also explain their consideration of the additional three factors if there are "two or more medical opinions or prior administrative medical findings about the same issue [that] are both equally well-supported … and consistent with the record … but are not exactly the same."  20 C.F.R. § 404.1520c(b)(3).  As noted in the Administration's 2017 revisions to the regulations, "the articulation requirements in [the] final rules" are intended to "allow a … reviewing court to trace the path of an adjudicator's reasoning."  Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5858 (Jan. 18, 2017); *see also Amber v. Saul*, No. 3:20-CV-490, 2021 WL 2076219, at *4 (N.D.N.Y. May 24, 2021) ("Although the new regulations eliminate the perceived hierarchy of

medical sources … the ALJ must still 'articulate how [he or she] considered the medical opinions' and 'how persuasive [he or she] find[s] all of the medical opinions'") (alteration in original) (quoting 20 C.F.R. § 404.1520c(a), (b)(1)).

An ALJ's failure to properly consider and apply the requisite factors is grounds for remand. *See, e.g.*, *Ballantyne T. v. Commissioner of Social Security*, No. 23-CV-11182, 2025 WL 551820, at *11 (S.D.N.Y. Feb. 19, 2025) (remanding due to the ALJ's failure to adequately explain how the supportability and consistency factors supported the decision); *Ayala v. Kijakazi*, 620 F. Supp.3d 6, 30 (S.D.N.Y. 2022) (same); *Rivera v. Commissioner of the Social Security Administration*, No. 19-CV-4630, 2020 WL 8167136, at *22 (S.D.N.Y. Dec. 30, 2020) (remanding so that ALJ may "reevaluate the persuasiveness assigned to the opinion evidence of record and explicitly discuss both the supportability and the consistency of the consulting examiners' opinions"), *R. & R. adopted*, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021).

## 2. The ALJ Improperly Relied On The Four Non-Examining Consultants Whose Opinions Were Based On A Materially Incomplete Record

The record reviewed by the ALJ in this case includes the opinions of seven doctors: one treating doctor (Dr. Rogg); two consulting doctors who examined Plaintiff (examining consultants Drs. Schaich and Kaci), and four consulting doctors who did not examine Plaintiff but reviewed her file (non-examining consultants Drs. Fernandez, Sherer, Schmidt-Deyoung, and Sharif-Najafi). The ALJ assessed each opinion for supportability and consistency and assigned the opinions varying degrees of persuasiveness. The ALJ found the opinions of the four non-examining consultants partially persuasive and relied on their opinions in finding the other opinions, or portions of them, not persuasive. Plaintiff argues that was error because the non-examining consultants provided conclusory

opinions based on incomplete medical records.  (Pl. Mem. at 17-18; Reply at 1-5.)  The Court agrees.

An ALJ may find a consulting doctor's opinion persuasive while finding a treating doctor's opinion unpersuasive.  *Tibbles v. Commissioner of Social Security*, No. 22-1127-CV, 2023 WL 3477127 (2d Cir. May 16, 2023) (summary order) (stating that an ALJ "may give greater weight to the report of a consultative physicians than to that of a treating physician"); *Amber H. v. Saul*, No. 3:20-CV-490, 2021 WL 2076219, at *5 (N.D.N.Y. May 24, 2021) (concluding that "an ALJ may rely on the opinion of a non-examining state agency consultant in disability claims" while discounting that of a treating physician).

Nonetheless, courts are "appropriately skeptical" when "the greatest degree of persuasion was assigned to a non-examining state agency consultant's opinion, and the least was afforded to plaintiff's own treatment providers."  *White v. Commissioner of Social Security*, No. 20-CV-6222, 2022 WL 951049, at *5 (S.D.N.Y. March 30, 2022) (quoting *Amber H.*, 2021 WL 2076219, at *8); *Ayala*, 620 F. Supp.3d at 34 (same); *see also Armstead v. Commissioner of Social Security*, No. 20-CV-2841, 2024 WL 5077582, at *15 (E.D.N.Y. Dec. 11, 2024) ("courts frequently find that RFC determinations that depend entirely on the opinions of non-examining experts and one-time consultative examiners are not supported by substantial evidence") (internal quotation marks omitted). The regulations acknowledge that "[b]ecause a treating source examines a claimant directly, they 'may have a better understanding of [a claimant's] impairment(s) ... than if the medical source only reviews evidence in [a claimant's] folder."  *Soto v. Commissioner of Social Security*, No. 19-CV-4631, 2020 WL 5820566, at *4 (E.D.N.Y. Sept. 30, 2020) (quoting 20 C.F.R. § 404.1520c(c)(3)(v)) (alternation in original).  Skepticism is all the

more appropriate in cases where mental health is a limiting disability "because the inherent subjectivity of a psychiatric diagnosis requires the physician rendering the diagnosis to personally observe the patient." *Ron I. v. Commissioner of Social Security*, No. 2:23-CV-489, 2024 WL 4678398, at *8 (D. Vt. Nov. 5, 2024).

Here, skepticism is well-warranted.  The opinions of all four non-examining consultants are flawed because they based their opinions on a materially incomplete medical record, and, three of them rendered entirely conclusory opinions.  *See Kelly v. Commissioner of Social Security*, No. 20-CV-5318, 2024 WL 5120051, *12 (E.D.N.Y. Dec. 16, 2024) ("Medical source opinions that are conclusory, stale, and based on an incomplete medical record may not be substantial evidence to support an ALJ finding"); *Rosario v. Kijakazi*, No. 20-CV-05490, 2022 WL 875925, at *14 (S.D.N.Y. Mar. 15, 2022) (same); *Cepeda v. Commissioner of Social Security*, No. 19-CV-4936, 2020 WL 6895256, at *10 (S.D.N.Y. Nov. 24, 2020) (same) (quoting *Camille v. Colvin*, 104 F. Supp.3d 329, 343-44 (W.D.N.Y. 2015), *aff'd*, 652 F. App'x 25 (2d Cir. 2016)).

Dr. Fernandez's opinion is dated September 14, 2022.  The complete file for Plaintiff includes treatment notes from 17 or so visits with Dr. McNeill that occurred prior to the date of Dr. Fernandez's opinion.  (R. 398-540, 793-804.)  Yet Dr. Fernandez did not review treatment notes from at least four of those visits because they were not in the administrative record at the time Dr. Fernandez rendered an opinion.[17]  (*See* R. 72-73.) The file also contains treatment notes from 10 or so visits with Dr. Rogg (as well as visits with an ear, nose, and throat specialist and a gynecologist) predating Dr. Fernandez's

---

[17] The four recorded treatment dates are June 12, 2021 (R. 793-94), January 10, 2022 (R. 795-97), February 14, 2022 (R. 798-99), and April 18, 2022 (R. 800-02).

opinion (2/10/21 – 7/13/22), as well as 10 or so visits post-dating the opinion (10/25/22 – 12/8/23).  (R. 807-949.)  Dr. Fernandez did not review *any* of Dr. Rogg's treatment notes because they were not at that time included in the administrative record.

That omission is quite significant when viewed in the context of Dr. Fernandez's opinion.  The *only* basis for Dr. Fernandez's opinion was review of the file, which was woefully incomplete at the time of review.  Indeed, Dr. Fernandez identified records from only two dates: a treatment record from Dr. McNeill dated June 13, 2022, and the consulting examiner opinion of Dr. Schaich dated August 21, 2022.  (R. 160.)  Dr. Fernandez then opined that Dr. Schaich's assessed limitations were "too restrictive based on the evidence in the file," and expressly noted the absence of "other objective evidence of marked limitations in her functioning" within the file.  (R. 160.)  The only evidence cited by Dr. Fernandez other than Dr. Schaich's own examination, which Dr. Fernandez characterized as "unremarkable," came from Plaintiff's self-reported adult function report. (R. 160*, see* R. 337-343.)   Some of Plaintiff's statements in that report do appear inconsistent with her own reported symptoms (and the limitations found by Dr. Schaich). (*See, e.g.*, R. 342 (reporting that she gets along "fine" with authority figures, including bosses.)  But the Court is in no position to conclude that Dr. Fernandez would have arrived at the same opinion about Plaintiff's limitations had Dr. Fernandez reviewed the extensive set of medical records from multiple treating doctors pre-dating Dr. Fernandez's opinion that were not then included in the file.

Dr. Schmidt-Deyoung's opinion, dated October 27, 2022, suffers from the same defects as Dr. Fernandez's opinion.  The file reviewed did not include the four visits with Dr. McNeill or *any* of Dr. Rogg's treatment records.  Dr. Schmidt-Deyoung cited only the

32

same June 13, 2022 treatment record referenced by Dr. Fernandez and the October 24, 2022 opinion of consulting examiner Dr. Kaci.  (R. 165-66.)  Even worse than Dr. Fernandez, Dr. Schmidt-Deyoung provided no informative analysis or reasoning.  Dr. Schmidt-Deyoung simply opined on various physical capabilities, recited the treatment record and Dr. Kaci's opinions, and concluded "[t]hese findings complete the medical portion of the disability determination."  (R. 166.)

The opinions provided by the two non-examining consultants in the fall of 2023 are similarly deficient and even more threadbare.  Even though Dr. Sherer gave an opinion as recently as May 19, 2023, the file *still* did not contain any of Dr. Rogg's treatment records for the approximately 16 appointments predating Dr. Sherer's opinion, nor did it include the outstanding treatment records from four of Plaintiff's visits with Dr. McNeill, all of which pre-dated Dr. Sherer's opinion.  Indeed, Dr. Sherer expressly commented that there were "[n]o additional [medical records] in file prior to the [last-insured date]."  (R. 175.)  Dr. Sherer noted that Plaintiff did not "allege any new allegations but reports worsening of all conditions."  (R. 175.)  Even so, Dr. Sherer opined, with no additional analysis provided, "Prior assessment confirmed."  (R. 175.)  That opinion is both highly conclusory and, like Dr. Fernandez's opinion, based on a troublingly incomplete record.  Dr. Sharif-Najafi's was no better.  Like Dr. Sherer, Dr. Sharif-Najafi simply observed that there were no additional medical records prior to the last-insured date, and summarily "affirmed" Dr. Schmidt-Deyoung's prior assessment.   (R. 178.)

The opinions of all four non-examining consultants are based on a materially incomplete record, and three of the opinions are substantially or entirely conclusory.[18] The opinions thus did not provide substantial evidence to support the ALJ's RFC determination.  *See Robert K. v. Kijakazi*, No. 21-CV-1095, 2023 WL 2242126, at *4 (N.D.N.Y. Feb. 27, 2023) ("Great weight should not be accorded to the opinion of a non-examining State agency consultant whose opinion is based on an incomplete record") (quoting *Coleman v. Colvin*, No. 14-CV-2384, 2015 WL 1190089, at *10 (S.D.N.Y. Mar. 16, 2015)); *Janette G. v. Commissioner of Social Security*, No. 3:20-CV-01496, 2022 WL 313884, at *6 (D. Conn. Feb. 2, 2022) (remanding and finding that ALJ erred in assessing great weight to non-examining consultant opinion, "which was formed without examining [plaintiff] and on the basis of a record that lacked [the treating doctor's] treatment notes"); *Marcano v. Berryhill*, No. 16-CV-08033, 2018 WL 2316340, at *27 (S.D.N.Y. Apr. 30, 2018) (remanding where ALJ gave considerable weight to a non-examining state medical consultant who "did not examine Plaintiff and rendered the opinion prior to the receipt of additional medical evidence"); *Rymer v. Colvin*, 62 F. Supp.3d 265, 274 (W.D.N.Y. 2014) (remanding where ALJ relied on non-examining consultants even though "approximately half of the record was submitted after their opinions were issued").[19]

---

[18] These facts distinguish the instant case from those the Commissioner cites in which courts found no fault with ALJ decisions that credited non-examining consultants over examining sources.  (*See* Def. Mem. at 12.)

[19] To be clear, the Court does not suggest that a non-examining consultant can **never** be found to be more persuasive than an examining consultant or a treating doctor.  To the contrary, the regulations require that no deference be afforded any particular medical source and that each is to be evaluated on the basis of supportability and consistency. In this case, however, the non-examining consultant examiners' opinions were compromised by the incomplete record and the conclusory nature of their opinions.

That the ALJ found the opinions of the non-examining consultants only "partially persuasive" does not render the decision's reliance on them any less significant. Their opinions played a material role in the ALJ's assessment of the other opinions and Plaintiff's RFC. First, the ALJ used the opinion of one non-examining consultant – Dr. Sharif-Najafi – to bolster the opinion of another – Dr. Schmidt-Deyoung – by observing that "their opinions are consistent with each other." (R. 28.) Moreover, the ALJ credited them in part because "both doctors had the opportunity to review the claimant's medical records." (R. 28.) Either the ALJ ignored the significant gap in the medical record that existed at the time of their opinions, was not aware of it, or considered it but did not to discuss it in his opinion. Under any of those scenarios, however, the deficiency is material.

Second, the ALJ relied on the opinions of the non-examining consultants to find unpersuasive the opinions of Dr. Schaich – who examined Plaintiff – and Dr. Rogg – who treated Plaintiff repeatedly throughout the relevant time period. The ALJ dismissed Dr. Rogg's opinion as "completely inconsistent with the opinions of the State Agency medical consultants." (R. 30.) Similarly, the ALJ found Dr. Schaich's opinion that Plaintiff had several marked limitations unpersuasive, in part because the opinion "is not consistent with the findings of the State Agency medical consultants." (R. 29.) The rejection of Dr. Schaich's opinion is particularly significant because Dr. Schaich "is the only mental health professional to both examine [Plaintiff] and to offer a medical opinion and was not contradicted by any other examining doctor [Dr. Kaci] or treating doctor [Dr. Rogg]." (Pl. Mem. at 21.) *See Moscatello v. Saul*, No. 18-CV-1395, 2019 WL 4673432, at *13 (S.D.N.Y. Sept. 25, 2019) (remanding and faulting ALJ for assigning greater weight to the

opinion of a non-examining consultant who performed a "paper review" as compared to the opinion of a consulting examiner who personally examined the plaintiff and administered a mental status exam).

In addition to relying on the opinions of the non-examining consultants, the ALJ offered a number of other reasons for rejecting the opinions of Dr. Schaich and Dr. Rogg. (See R. 29-30.)  The Court cannot conclude, however, that there is "no reasonable likelihood" that the ALJ's determination would change if the non-examining consultants were to revise their opinions based on the complete record.  *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010).

The Commissioner offers little evidence to oppose the material deficiency in the evidence relied upon by the ALJ.  First, the Commissioner asserts that "even accepting the fact that the medical consultants did not have access to the entire medical record, there is no rule or regulation requiring a medical consultant review the entire record before reaching an opinion." (Def. Mem. at 13.)  That is true.  *See Rodriguez v. Kijakazi*, No. 21-CV-2358, 2022 WL 3211684, at *15 (S.D.N.Y. Aug. 9, 2022) (a "medical opinion is [not] stale merely because it pre-dates other evidence in the record") (alteration in original). But, as set forth above, courts regularly find error in relying on non-examining consultants whose opinions are found to be conclusory, stale, and based on an incomplete record. Here, the non-examining consultants' opinions were stale (in that they did not include treatment records dating from after their opinions), conclusory (for three of them), and based on a materially incomplete record for the time period they purported to opine about.

Second, the Commissioner asserts that "the ALJ's discussion considered the later submitted treatment records … in finding the [non-examining consultants] partially

36

persuasive." (Def. Mem. at 13.) That is correct. But the ALJ cannot offer his own lay interpretation of the medical data to assess the non-examining consultants' opinions, particularly when the consultants did not even have the later submitted medical records on which to base their opinions. *See Russ v. Commissioner of Social Security*, 582 F. Supp.3d 151, 165 (S.D.N.Y. 2022) ("it is 'fundamentally unfair' for the ALJ … to substitut[e] his own opinion with respect to a significant and lengthy period of the medical record on which no doctor opined").[20] After all, the entire basis of a non-examining consultant's opinion is his or her review of the medical record. To be clear, the issue is not just that the non-examining consultants did not have records of treatment that post-date their opinions (although that too is a limiting factor in its own right). Rather, it is also that they based their opinions on a review of the record without the benefit of records for numerous visits with treating doctors that pre-dated their opinions.

Third, the Commissioner states that "Plaintiff's brief fails to show how any of the subsequent evidence is inconsistent with the [non-examining consultant opinions] and requires greater limitations." (Def. Mem. at 13.) The Commissioner cites no law requiring the Plaintiff to do so. What matters is whether the ALJ erred, which he did, and whether

---

[20] Dr. Rogg provided his opinions – and, importantly, was the only doctor to do so based on his own treatment and treatment records of Plaintiff – but the ALJ rejected his opinions as unpersuasive. As a result, the ALJ improperly assigned to himself the role of sole interpreter of Dr. Rogg's treatment records for all of the relevant time period, and determined their impact on Plaintiff's RFC. *See Kelly W. v. Commissioner of Social Security*, No. 20-CV-581, 2022 WL 600838, at *4 (W.D.N.Y. Mar. 1, 2022) ("An ALJ is of course free to analyze medical records to determine what the weight of the evidence supports, but that does not give him a license to interpret raw medical data that would require the expertise of a physician or other trained medical source") (internal quotation marks omitted); *Leslie H. L. v. Commissioner of Social Security Administration*, No. 3:21-CV-00150, 2021 WL 5937649, at *6 (D. Conn. Dec. 16, 2021) (ALJ erred when they "evaluated the treatment notes and interpreted them himself as 'benign,' then used that interpretation to craft an RFC").

his decision is supported by substantial evidence, which it is not. Neither Plaintiff, nor the Court, are in a position to determine what functional limitations are appropriate based on Dr. Rogg's medical records and findings – records and findings that only the ALJ reviewed. The case the Commissioner cites in support is inapt. In *Andrews v. Berryhill*, 6:17-CV-06368-MAT, 2018 WL 2088064, at *3 (W.D.N.Y. May 4, 2018), the court found that an ALJ did not err by relying on older opinions where there was no evidence in the record to show any significant deterioration in the plaintiff's condition since the opinions were finalized. As already explained, the issue here is not merely the staleness of the non-examining consultants' opinions in light of subsequent treatment, but also the substantially incomplete medical record for the time period on which their reviews were based.

In short, the opinions of the four examining consultants were materially flawed, and the ALJ erred in relying on them to the extent he did to formulate Plaintiff's RFC. Plaintiff raises additional arguments critiquing the ALJ's assessment of the opinions of Dr. Schaich,[21] Dr. Kaci, and Dr. Rogg. (Pl. Mem. at 20-23.) The Court does not pass upon those arguments (other than to the extent mentioned above). On remand, however, the ALJ will have to reassess each medical source opinion anew in light of re-evaluation of

---

[21] It is of particular concern that the ALJ did not even address Dr. Schaich's "guarded" prognosis. A "[g]uarded prognosis refers to a prognosis given by a physician [expressing that] the outcome of a patient's illness is in doubt." *Coleman v. Commissioner of Social Security*, No. 15-CV 6624, 2017 WL 1155786, at *4 (E.D.N.Y. Mar. 27, 2017) (quoting TABER'S CYCLOPEDIC MEDICAL DICTIONARY, 914 (21st ed. 2009)). *See Vasquez v. Commissioner of Social Security*, No. 14-CV-6900, 2015 WL 4562978, at *17 (S.D.N.Y. July 21, 2015) (finding ALJ erred by failing to discuss "guarded" prognosis, among other errors).

the opinions of the four non-examining consultants. The ALJ may also want to consider having the non-examining consultants review the complete medical record.

## B.    Plaintiff's Subjective Statements

Plaintiff also charges the ALJ with error in assessing Plaintiff's statements about her symptoms. That assessment, along with the ALJ's evaluation of the medical opinion evidence and medical record, informs the ALJ's RFC determination. Accordingly, the Court finds it appropriate to address the issue at this juncture.

In determining disability, the Commissioner must consider all of the claimant's symptoms, including pain. *See* 20 C.F.R. § 404.1529(a). An ALJ has the "discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical findings and other evidence, regarding the true extent of the [symptoms] alleged by the claimant." *Aronis v. Barnhart*, No. 02-CV-7660, 2003 WL 22953167, at *7 (S.D.N.Y. Dec. 15, 2003) (quoting *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)).

An ALJ must follow a two-step process in evaluating a claimant's subjective description of their symptoms. *See* 20 C.F.R. § 404.1529(c); *Meadors v. Astrue*, 370 F. App'x 179, 185 (2d Cir. 2010) (summary order) (remanded for failure to apply the two-step analysis). At the first step, the ALJ determines whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(c)(1); *Meadors* at 183.

If the claimant does suffer from such an impairment, the ALJ then considers "the intensity and persistence of an individual's symptoms" to determine the extent to which the symptoms limit the individual's ability to do basic work activities. SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017); *see also* 20 C.F.R. § 404.1529(c); *Cichocki v. Astrue*,

39

534 F. App'x 71, 75-76 (2d Cir. 2013) (summary order); *Cullen v. Kijakazi*, No. 23-CV-1690, 2024 WL 564501, at *15 (S.D.N.Y. Feb. 9, 2024) (affirming the ALJ's conclusion at step two), *R. & R. adopted*, 2024 WL 1158455 (S.D.N.Y. Mar. 18, 2024).  When assessing the credibility of a claimant's statements about the intensity, persistence, or functionally limiting effects of his symptoms, the ALJ considers the following types of evidence, in addition to any objective medical evidence that substantiates the claimant's statements:

> (1) Daily activities; (2) The location, duration, frequency, and intensity of pain or other symptoms; (3) Factors that precipitate and aggravate the symptoms; (4) The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

SSR 16-3p, 2017 WL 5180304, at *7-8; *see also* 20 C.F.R. § 404.1529(c)(3); *Watson v. Berryhill*, 732 F. App'x 48, 52 (2d Cir. 2018) (summary order).

When the ALJ rejects a claimant's testimony in light of objective medical evidence and other relevant factors, the ALJ must explain that decision with "sufficient specificity to enable the [reviewing] Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence." *Calzada v. Astrue*, 753 F. Supp.2d 250, 280 (S.D.N.Y. 2010) (alteration in original) (internal quotation marks omitted); *see also Rosario v. Astrue*, No. 12-CV-3594, 2013 WL 3324299, at *8 (S.D.N.Y. June 25, 2013) (ALJ's credibility determination entitled to

deference unless it is "not set forth 'with sufficient specificity'") (quoting *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984)).

Here, the ALJ applied the correct legal principles in evaluating Plaintiff's subjective complaints, and reached findings supported by substantial evidence. (*See* R. 27-28.) The ALJ recited and applied the two-step process for evaluating a claimant's symptoms. (R. 27.) The ALJ found that Plaintiff's mental impairments could reasonably be expected to produce the symptoms of which Plaintiff complained. (R. 27.) The ALJ then proceeded to step two, and determined that Plaintiff's subjective reporting of the intensity, persistence, and limiting effects of her symptoms was not consistent with the record. (R. 27-28.) In doing so, the ALJ explained his reasoning with specificity. (R. 28.) He addressed Plaintiff's daily activities, her ability to drive, and other objective evidence from the record, all of which the ALJ deemed inconsistent with Plaintiff's description of her symptoms. (R. 28.)

Plaintiff argues that the ALJ's reasoning was flawed in two ways.[22] (Pl. Mem. at 27.) First, she asserts that the ALJ's conclusion at step two was merely conclusory and "makes no sense" because the ALJ had already found that the objective medical evidence showed that Plaintiff's medically determinable impairments could reasonably be expected to produce the symptoms of which she complained. (*Id.*) That argument, however, conflates the different inquiries posed by the two steps. The first step looks at the type of symptoms – e.g., pain, nausea, tingling, etc. that an impairment can be expected to cause. The second step assesses the intensity, persistence, and limiting effects of those

---

[22] Notably, Plaintiff does not defend her symptom-assessment arguments in her reply brief. Rather, her reply addresses only the ALJ's weighing of the medical opinion evidence, and the VE's testimony. (*See* Reply.)

41

symptoms as reported by the claimant.  Objective medical evidence can support the former yet still be inconsistent with the latter.

Second, Plaintiff disagrees with the import the ALJ placed on her daily activities. (*Id.* at 27-29.)  Daily activities, however, are one of the factors the ALJ may properly consider.  SSR 16-3p.  To be sure, the abilities of a claimant to engage in basic daily activities, such as those performed by Plaintiff – self-care, light cleaning and shopping, preparing simple meals, local driving, visits with family and friends – are not necessarily incompatible with a finding of disability.  Afterall, it has long been recognized that "a claimant need not be an invalid to be found disabled under the Social Security Act." *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (internal quotation marks omitted).  But daily activities are still a relevant factor that may be considered along with other factors, which the ALJ did here.  Nor does it matter that the record does not show that Plaintiff can perform **some** tasks "on a regular and continuing basis – i.e., eight hours a day, five days week."  (Pl. Mem. at 28.)  While the ALJ's RFC assessment focuses on the claimant's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis, SSR 96-8p, an ALJ's assessment of claimant credibility is a different inquiry.[23]

Plaintiff further contends that the ALJ "mischaracterized much of what she said." (Pl. Mem. at 28.)  With respect to the specific instances cited by Plaintiff, the Court disagrees.  The ALJ specifically used qualified terms such as "light" shopping and

---

[23] Moreover, although emphasizing the local and occasional nature of Plaintiff's driving, Plaintiff's briefs do not address the ALJ's finding that Plaintiff's driving demonstrates Plaintiff's ability to use hand and foot controls, turn her head to consult mirrors, sit for a continuous period for time, and bend and stoop to get into the car.  (R. 28.)

cleaning, and "simple" meals.  (R. 28.)  He correctly characterized Plaintiff as driving "locally" and to doctor visits.  (R. 28.)  And, his reference to Plaintiff's having "good relationships" with her family and friends is accurate.  (R. 28.)  Even if of limited relevance to Plaintiff's ability to function well with work colleagues and supervisors, her "good relationships" with family and friends is not necessarily irrelevant to that ability.[24]

In finding Plaintiff's reporting of her symptoms not entirely consistent with the record, the ALJ juxtaposed Plaintiff's testimony that "she has been vomiting every morning for the last two years" with "indications of occasional nausea" in the medical records.  (R. 28.)   One could take issue with the ALJ's characterization of Plaintiff as having experienced only "occasional" nausea, depending on one's definition of "occasional."  Regardless, the ALJ's point is correct:  there is no evidence in the treating medical records (as distinct from what Plaintiff reported to consulting doctors for her disability determination) to support Plaintiff's assertion that she vomited daily for two years.  Simply put, the ALJ found Plaintiff to be exaggerating the extent of some of her symptoms, and did not err in doing so.

Finally, Plaintiff faults the ALJ for failing to fully consider "the fact that Plaintiff had already undergone **brain surgery** to remove a tumor, which precipitated her disability." (Pl. Mem. at 29.)  Plaintiff then cites a case where a claimant decided to undergo surgery despite warnings from his doctors that it might not lessen the pain, and the court found that the claimant's "decision to go forward with the surgery despite a guarded prognosis is a far more probative indicator of the credibility of plaintiff's complaints than his ability to

---

[24] Although the ALJ did not point to it, Plaintiff's self-completed adult-function report, dated February 18, 2023, indicates that she gets along "fine" with authority figures, including bosses.  (R. 342.)

cook." (*Id.*, citing *Castano v. Astrue*, 650 F. Supp.2d 270, 279 (E.D.N.Y. 2009).)  That principle makes eminent sense, but it does not apply here.  Plaintiff had surgery to remove the first meningioma in 2017.  Substantial symptoms followed, and the present issue is the assessment of the magnitude and extent of her symptoms from approximately January 2021 to March 2023.  Plaintiff has not undergone any surgery to lessen those symptoms, and the record does not suggest that doing so was an option.  Plaintiff's invocation of *Castano* is therefore inapt.

In sum, the ALJ's assessment of Plaintiff's symptoms was proper.  However, on remand, the ALJ should consider whether reassessment of the medical opinions has any consequences for his evaluation of Plaintiff's reported symptoms.

## C.    The VE's Testimony

Plaintiff challenges the ALJ's reliance on the VE's testimony at step five of the sequential analysis.  The ALJ's determination at step five, and the hypothetical questions posed to the VE, are necessarily informed by Plaintiff's RFC and the ALJ's evaluation of the medical opinion evidence.  Inasmuch as the ALJ will be required on remand to reassess the medical opinion evidence and revisit his RFC determination, it would be premature for the Court to address Plaintiff's challenge to the ALJ's step-five determination. *See David Q. v. Commissioner of Social Security*, No. 20-CV-1207, 2022 WL 806628, at *7 (W.D.N.Y. Mar. 17, 2022) ("Because I find that remand is warranted due to the ALJ's erroneous consideration of plaintiff's mental impairment in the RFC assessment, I decline to address plaintiff's remaining contentions"); *Kristie v. Commissioner of Social Security*, No. 5:18-CV-0991, 2019 WL 6768567, at *8 (N.D.N.Y. Dec. 12, 2019) ("Because remand is necessary to address the issues identified … the

44

Court declines to reach a finding on Plaintiff's other arguments regarding the ALJ's Step Five determination and the VE testimony"); *Arroyo v. Colvin*, No. 14-CV-3513, 2016 WL 47871, at *12 (E.D.N.Y. Jan. 4, 2016) ("Because the Court has asked the ALJ to reevaluate Plaintiff's RFC on remand, a finding as to whether consultation with a vocational expert is required is premature at this stage"). Accordingly, the Court does not address the issue further.

## CONCLUSION

For the foregoing reasons, the Petitioner's motion should be GRANTED, the Commissioner's motion should be DENIED, and the case should be remanded. On remand, the ALJ should revisit his evaluation of the medical opinion evidence for all medical sources in light of the inadequacy of the opinions provided by the four non-examining consultants.

## PROCEDURES FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days to file written objections to this Report and Recommendation. Any party shall have fourteen (14) days to file a written response to the other party's objections. Any such objections and responses shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable John G. Koeltl, United States Courthouse, 500 Pearl Street, New York, New York 10007, and to the Chambers of the undersigned, at United States Courthouse, 500 Pearl Street, New York, New York 10007. Any request for an extension of time for filing objections must be addressed to Judge Koeltl. **Failure to file timely objections will result in a waiver of the right to object and will preclude appellate review.**

45

RESPECTFULLY SUBMITTED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: December 12, 2025
        New York, New York

Copies transmitted this date to all counsel of record.